UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LESLIE CHISLETT,

                    Plaintiff,

       -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION and RICHARD CARRANZA,

                   Defendants.

Case No. 1:21-cv-09650 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

      Leslie Chislett ("Chislett" or "Plaintiff"), a white woman, alleges race discrimination

under 42 U.S.C. § 1983 ("Section 1983") by her former employer, the New York City

Department of Education (the "Department" or "DOE") and its then-Chancellor, Richard

Carranza ("Carranza" and, together, "Defendants").  ECF No. 1-1 (the "Amended Complaint" or

"Am. Comp.") ¶¶ 102-112.  Before the Court is Defendants' motion for summary judgment.[1]

*See* ECF Nos. 44 ("Br."), 56 ("Reply").  Chislett opposes the motion.  ECF No. 52 ("Opp.").  For

the following reasons, Defendants' motion is GRANTED.

## BACKGROUND

### I.   Facts

#### A.  Plaintiff's Hiring at OEA

      In 2007, Chislett began working for the Department as an assistant principal at a high

---

[1] In support of their motion, Defendants submitted a joint Local Civil Rule 56.1 statement of
undisputed material facts (ECF No. 41 ("JSOF")); their own Rule 56.1 statement (ECF No. 43);
and an attorney declaration with attached exhibits (ECF No. 42).  In opposition to Defendants'
motion, Chislett submitted her declaration with attached exhibits (ECF No. 50 ("Chislett
Decl.")); an attorney declaration with attached exhibits (ECF No. 51); and a response to
Defendants' Rule 56.1 statement (ECF No. 53 ("RSOF")).  The parties thereafter submitted
supplemental letters (ECF Nos. 59-60) regarding *Herrera v. New York City Department of
Education*, No. 21-cv-07555 (MKV), 2024 WL 245960 (S.D.N.Y. Jan. 23, 2024).

school in the Bronx.  JSOF ¶ 16; *see* Chislett Decl. ¶ 2.  Over the next decade, she held various

roles in the Department as both a principal and an administrator.  *See* JSOF ¶ 16; ECF No. 50-2.

In September 2017, Chislett became Executive Director of the Department's "AP for All"

program, which is part of the Department's Office of Equity and Access (the "OEA").  *See* JSOF

¶ 17; Chislett Decl. ¶ 8; ECF No. 50-36 ("Winkfield Dep.") at 28:9-13.  The "AP for All"

program's goal is to expand access to advanced-placement courses for public school students.

*See* ECF No. 50-5.

As Executive Director, Chislett supervised thirteen Content Area Specialists and two

Senior Directors.  Chislett Decl. ¶ 9; *see* RSOF ¶ 26.  Until June 2018, Chislett reported to

LaShawn Robinson, the Executive Superintendent who headed the OEA.  JSOF ¶ 9; Chislett

Decl. ¶ 10.  Robinson was then promoted to Deputy Chancellor, and Dr. Ruby Ababio-

Fernandez, who is Black, replaced her as head of the OEA, and as Chislett's direct supervisor, in

August 2018.  Chislett Decl. ¶¶ 27-28; JSOF ¶ 14.

### B.  Complaint About Plaintiff

Within weeks of Chislett's start at OEA, senior director Akua Adefope ("Adefope") –

who Chislett supervised – reported her to the Department's Office of Equal Opportunity and

Diversity Management (the "OEO").  RSOF ¶ 27; *see* ECF No. 51-2 ("Adefope Statement").

Adefope claimed that Chislett had engaged in microaggressions toward people of color, such as

ignoring, interrupting, and belittling them, and described two instances in which she felt that

Chislett had engaged in such behaviors.  *See* Adefope Statement; ECF No. 50-11 ("OEO

Report") at 1-2.  After an investigation, the OEO concluded in July 2018 that, while some of

Chislett's comments did not rise to the level of discrimination, they were inappropriate.  RSOF

¶ 28; *see* OEO Report at 10-13.  Chislett was directed to attend a professional development

course led by the OEO.  RSOF ¶ 28.

### C.  Defendants' Alleged Policy

Appointed by Mayor Bill de Blasio, Carranza began working as Chancellor of the Department in April 2018.  *Id.* ¶ 10; JSOF ¶ 8.  The parties dispute whether, under de Blasio's direction and Carranza's leadership, the Department had a policy or practice of using race as a determinative factor in employment decisions.  *See* RSOF ¶¶ 1-7, 12-13.  Defendants assert in their motion papers that "[d]e Blasio did not task Carranza with a policy to have a diverse cabinet or administration," and that he "never told Carranza that he wanted race to play a role in hiring decisions."  Br. at 2.  Defendants also cite de Blasio's deposition testimony that his "first consideration" in making staffing decisions at the Department "was always the capacity to do the job."  *Id.*; *accord* ECF No. 50-31 ("De Blasio Dep.") at 49:25-50:2.[2]  As Defendants note, Carranza testified that de Blasio did not task him with having a diverse cabinet or administration. ECF No. 50-32 ("Carranza Dep.") at 85:10-15.  Carranza also denied taking "the race of the candidates into account when filling senior-level positions."  *Id.* at 130:19-23.

In response, Chislett cites deposition testimony from de Blasio, Carranza, and Ursulina Ramirez, the head of de Blasio's transition team for the Department.  *See* Opp. at 12-13.  The former mayor testified that it was "a policy [for his] administration to reflect the diversity of the city," De Blasio Dep. at 26:13-15, and that, for him, race was an "[i]mportant factor . . . but not the priority" "when making hiring decisions at the DOE," *id.* at 50:7-15.  Ramirez, who led the effort to select Department candidates for de Blasio's review, stated that the mayor sometimes "fixated on [the] diversity of candidates" for cabinet and senior leadership roles.  ECF No. 50-33 ("Ramirez Dep.") at 93:3-10.  Meanwhile, Carranza affirmed that he believes it is "important"

---

[2] The parties agreed to rely in part on the depositions taken in two ongoing cases in which the plaintiffs allege discrimination against the Department.  *See* Opp. at 12 n.1; Reply at 2-3; *Bellis v. N.Y.C. Dept. of Educ.*, No. 21-cv-03282 (JMF) (S.D.N.Y.); *Herrera v. N.Y.C. Dept. of Educ.*, No. 21-cv-07555 (MKV) (S.D.N.Y.).

for students to "see people that look like them . . . in senior [Department] leaders." Carranza Dep. at 130:5-12.

### D. Implicit-Bias Trainings

Chislett further states that the Department tasked the OEA with preparing implicit-bias trainings and providing those trainings to employees throughout the Department. Chislett Decl. ¶ 18. She argues that these trainings "were a direct offshoot" of Defendants' focus on race. Opp. at 15. Chislett further claims that the OEA, "as the crucible for the DOE's development of implicit bias trainings, had a number of different trainings and meetings that [she] was required to attend." Chislett Decl. ¶ 19.

Chislett objects to statements made during several of these sessions. She asserts that, during one OEA training on May 4, 2018, the first that Chislett was required to attend, the instructor told participants that "white colleagues must take a step back and yield to colleagues of color." *Id.* ¶ 47. Chislett states that, at this training, she overheard Robinson tell another Department employee that "[w]e've all taken on whiteness." *Id.*; *see* ECF No. 50-29 ("Chislett Dep.") at 122:23-123:20. At an OEA overnight retreat on May 10, 2018, according to Chislett, speakers described examples of values consistent with "white supremacy," including perfectionism and "devotion to the written word." Chislett Decl. ¶¶ 24-25; Chislett Dep. at 131:6-7, 132:14-15. During another training (with participants from throughout the Department) on June 21, 2018, Chislett asserts that one of the facilitators, Ababio-Fernandez, concluded a presentation by telling the audience, "There is white toxicity in the air, and we all breathe it in." Chislett Decl. ¶ 33. When Chislett declined to participate in a small-group exercise that asked people to list "white values" on a poster, another person publicly called her a "horrible person." *Id.* ¶ 35; Chislett Dep. at 138:7.

Chislett claims that these "meetings and trainings[,] focused on 'whiteness[,]'

exacerbated" a workplace that was already "racially charged."  Opp. at 6 (hyphen omitted).

According to Chislett, one team member said in July 2018 that Chislett had been "socialized as a

white person to be defensive" after Chislett responded to criticism of her proposed changes to the

AP for All team structure.  Chislett Decl. ¶ 48.  In September 2018, after Chislett asked senior

director Deonca Renee why she was late to a morning meeting that she was supposed to help

lead, Renee identified Chislett's "white privilege" underlying the exchange.  *Id.* ¶ 50.  Chislett

claims that her team "regularly accused" her "of favoring Caucasian employees" and called her

"white and fragile" when she tried to respond.  *Id.* ¶ 51.  Chislett asserts that, in November 2018,

Adefope called her racist.  *Id.* ¶ 52.  She also claims Adefope and Renee told her around that

time that "race is at the center of every" conversation they have with her.  *Id.* ¶ 52; *accord*

Chislett Dep. at 167:3-4.

Towards the end of 2018, Ababio-Fernandez asked Courtney Winkfield, who is white, to

meet with Chislett and coach her on the interpersonal issues she was having with members of her

team.  *See* RSOF ¶¶ 29, 31.  At the time, Winkfield worked as a coach for other Department

employees.  *Id.* ¶ 30.  During their meetings, Chislett shared that she was struggling to lead two

members of her team, namely Adefope and Renee.  *See* Winkfield Dep. at 78:20-24, 79:16-21,

80:5-16, 81:9-20; Chislett Decl. ¶ 58.  Winkfield's guidance focused on coaching Chislett "to

stop trying to be so punitive in her leadership style" and, instead, "to build relationships and trust

with these individuals."  Winkfield Dep. at 84:11-17; *see id.* at 93:3-10 (encouraging Chislett to

engage in coaching conversations rather than formal discipline); Chislett Decl. ¶ 60.

Chislett asserts that she attended other trainings in 2019 that made her uncomfortable.  At

one such training on January 23, 2019, a facilitator suggested that racial equity required focusing

"equitable strategies and interventions" regarding Black students instead of white students.

Chislett Decl. ¶ 64.  In an OEA training on February 12, 2019, Renee said that Chislett was concerned only with "goals," which Renee associated with "white supremacy."  *Id.* ¶ 68.  Others allegedly accused Chislett at that training of "white privilege," "tokenism," and "retaliation."  *Id.* At a later planning meeting, Chislett complained that trainings like the one on February 12, 2019 were counterproductive to AP for All's mission and divided its team members by their race.  *Id.* ¶ 74.  Renee, who attended this meeting, accused Chislett of having implicit bias.  *Id.* ¶ 75.

### E.  Changes to Plaintiff's Role

In early 2019, Winkfield began working in OEA as a senior strategy and policy advisor. RSOF ¶ 32; Winkfield Dep. at 31:13-18.  In this capacity, Winkfield became the head of the AP for All program and Chislett's direct supervisor.  Chislett Decl. ¶ 62.  During this time, several employees complained to Winkfield about Chislett's leadership.  RSOF ¶ 34.  Among the grievances raised were concerns that Chislett was inconsistent in how she enforced rules and policies, overly harsh with some employees but overly lenient with others, unprofessional in small group and team settings, and ineffective as a leader.  *Id.* ¶ 36.  Two other Department employees who did not work in the OEA also informed Winkfield that Chislett was a poor performer.  *Id.* ¶¶ 37-38.

On March 20, 2019, Winkfield removed Chislett's supervisory duties.  RSOF ¶ 39; *see* Chislett Decl. ¶ 70 (asserting that Ababio-Fernandez also participated in this meeting).  While Chislett kept her salary and benefits, RSOF ¶ 44, she no longer supervised any Department employees, Winkfield Dep. at 104:10-21, 116:12-15.  In her deposition, Winkfield attributed this decision to "a pattern of feedback from nearly every member of the team that expressed that they did not believe her to be an effective leader and that they believed that she created chaos and a negative work environment."  *Id.* at 116:5-9.  The parties dispute whether Winkfield assumed Chislett's supervisory duties or assigned them to Adefope.  *See* RSOF ¶ 43; Chislett Dep. at

161:9-22.

### F.  Plaintiff's Departure from OEA

On April 16, 2019, Winkfield required the AP for All team to engage in eight weeks of "racial literacy training."  Chislett Decl. ¶ 80.  When Chislett complained to Winkfield about a required reading for these trainings, Winkfield said that "[t]hese trainings are not going to change" and that "[t]hey are used all around the country."  *Id.* ¶¶ 81-82.

On May 18 and 20, 2019, the New York Post published two articles highlighting the Department's implicit-bias trainings.  Chislett Decl. ¶¶ 84-85; *see* ECF Nos. 50-19, 50-20.  Chislett spoke anonymously with a reporter for both articles, but claims her supervisors knew that she had done so.  Chislett Decl. ¶ 83.

On May 23, 2019, Chislett and approximately 50 other Department employees – of whom about 20 were white – attended the first day of a two-day OEA staff retreat led by Ababio-Fernandez.  JSOF ¶ 18; RSOF ¶¶ 47-48.  During the retreat, there was a back-and-forth between some OEA staff and Chislett.  RSOF ¶ 45.  Multiple OEA employees stood up and spoke out against Chislett.  *Id.* ¶ 46.  According to Chislett, Renee stood and called her out as having harmed the work of the OEA.  Chislett Dep. at 175:13-176:5; Chislett Decl. ¶¶ 94-95.  At least one other employee, Adefope, also stood and claimed mistreatment by Chislett.  *See* Chislett Dep. at 177:1-9.  Another suggested, while looking at Chislett, that those opposed to the OEA's philosophy should "just go," for which others clapped and snapped their fingers in agreement.  *Id.* at 176:10-19.  No one stood up and spoke out against any other employee.  RSOF ¶ 49.  When Ababio-Fernandez called for a break, Chislett left the retreat.  *Id.* ¶¶ 50-51.

That day was Chislett's last at the Department.  JSOF ¶ 19.  On September 10, 2019, after exhausting her medical leave, Chislett wrote to Ababio-Fernandez and Winkfield that she was not "able to return to work."  ECF No. 50-28 at 3 (Chislett's exit letter); *see* RSOF ¶ 53.

## II.     Procedural History

Chislett brought this action in state court on October 1, 2019.  ECF No. 1 ¶ 1.  After Chislett amended her complaint on October 25, 2021, *id.* ¶ 2, Defendants removed the case to federal court on November 22, 2021, *see generally id.*  As the case proceeded through discovery, it was reassigned to the undersigned on September 16, 2022.  *See* ECF No. 20.

In her operative complaint, Chislett alleges discrimination by Defendants in violation of Section 1983.  Am. Compl. ¶¶ 102-112.  Chislett also brought two claims under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*, Am. Compl. ¶¶ 85-101, but she voluntarily dismissed those claims with prejudice on May 4, 2023, ECF No. 37.

On June 16, 2023, Defendants moved for summary judgment on Chislett's 1983 claim. *See* Br.; Reply.  Chislett opposed the motion.  *See* Opp.  Defendants' summary judgment motion is thus fully briefed and presently before the Court.[3]

## III.    Applicable Legal Standard

Under Federal Rule of Civil Procedure ("Rule") 56, a moving party is entitled to summary judgment if, on any claim or defense, that party demonstrates from the admissible evidence and pleadings "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute over an issue of material fact is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex*

---

[3] Chislett requested oral argument on the motion in a notation on her opposition brief.  *See* Opp. In an exercise of its discretion, the Court denies that request because oral argument would not be helpful to the Court.  *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999) (noting that "a district court's decision whether to permit oral argument rests within its discretion").

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party

who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can

point to an absence of evidence to support an essential element of the nonmoving party's claim."

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*,

477 U.S. at 322-23).

      In ruling on a motion for summary judgment, the court must view all evidence "in the

light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*,

373 F.3d 83, 89 (2d Cir. 2004), and "resolve all ambiguities and draw all permissible factual

inferences in favor of the party against whom summary judgment is sought," *Est. of Gustafson ex

rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of

Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  To defeat a motion for summary judgment,

the non-moving party must advance more than "a scintilla of evidence," *Anderson*, 477 U.S. at

252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rule 56 "does not impose an

obligation on a district court to perform an independent review of the record to find proof of a

factual dispute."  *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  It is

instead the parties' responsibility to "point out" contested facts for the Court, and "to clarify the

elements of the substantive law which remain at issue because they turn on contested facts."

*Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).

## DISCUSSION

      Section 1983 authorizes a civil action against a "person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any

citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws."  42 U.S.C. § 1983.  "Section 1983 'is not itself a source of

substantive rights.'"  *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting

*Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  Rather, it provides "a method for vindicating

federal rights elsewhere conferred," such as by the Equal Protection Clause of the Fourteenth

Amendment.  *Id.* (citation omitted); *see Students for Fair Admissions, Inc. v. President &*

*Fellows of Harvard Coll.*, 600 U.S. 181, 204 (2023) (noting that the Equal Protection Clause

prohibits "race-based state action"); *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)

(explaining that Section 1983 and the Equal Protection Clause, together, protect public

employees from discrimination).

When a Section 1983 defendant is a municipality, or a municipal agency such as the New

York City Department of Education, a plaintiff is required to show that the challenged acts were

performed "under color of some official policy" or custom.  *Okin v. Vill. of Cornwall-on-Hudson*

*Police Dep't*, 577 F.3d 415, 439 (2d Cir. 2009) (quoting *Monell v. Dep't of Soc. Servs. of City of*

*N.Y.*, 436 U.S. 658, 692 (1978)).  "The elements of a *Monell* claim are (1) a municipal policy or

custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional

right."  *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).  "[A] plaintiff must

demonstrate that 'through its *deliberate* conduct, the municipality was the "moving force"

behind the injury alleged.'"  *Id.* at 98 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,

520 U.S. 397, 404 (1997)).  To establish an "official policy or custom" as part of a *Monell* claim,

a plaintiff must prove one of the following: "(1) a formal policy; (2) actions taken or decisions

made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice

so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive

knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees

that amounts to deliberate indifference to the rights of those with whom municipal employees

will come into contact." *Fierro v. City of New York*, No. 20-cv-09966 (GHW), 2022 WL

428264, at *10 (S.D.N.Y. Feb. 10, 2022) (further quotation marks and citations omitted).

A similar showing is required for Section 1983 claims against a government-official

defendant. An individual may be held liable under Section 1983 only if that individual is

"personally involved in the alleged deprivation." *Littlejohn v. City of New York*, 795 F.3d 297,

314 (2d Cir. 2015) (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107,

127 (2d Cir. 2004)). "If an individual defendant has not *personally* violated a plaintiff's

constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant."

*Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019) (brackets omitted) (quoting *Raspardo v.

Carlone*, 770 F.3d 97, 115 (2d Cir. 2014)). A plaintiff can establish a defendant's personal

involvement by showing that:

> (1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation
> through a report or appeal, failed to remedy the wrong, (3) the
> defendant created a policy or custom under which unconstitutional
> practices occurred, or allowed the continuance of such a policy or
> custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the
> defendant exhibited deliberate indifference . . . by failing to act on
> information indicating that unconstitutional acts were occurring.

*Littlejohn*, 795 F.3d at 314 (ellipsis in original) (quoting *Back*, 365 F.3d at 127).

Plaintiff asserts that Carranza, the former Chancellor of the Department, is liable because

he created a municipal policy or custom that his Department subsequently implemented. *See*

Opp. at 17; *Patterson*, 375 F.3d at 226 ("[W]hen the defendant . . . [is] an individual sued in his

official capacity, . . . the plaintiff is required to show that the challenged acts were performed

pursuant to a municipal policy or custom."). Therefore, to prevail on her claim against the two

municipal defendants in this case – the Department and Carranza – Chislett must first establish a

violation of her constitutional rights, and then connect that violation to a municipal policy or custom. *See Monell*, 436 U.S. at 690-91; *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action . . . ; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." (further emphasis omitted)); *Oliver v. City of New York*, 540 F. Supp. 3d 434, 436 (S.D.N.Y. 2021) ("In a lawsuit containing a *Monell* claim, if the plaintiff cannot show that his or her constitutional rights were violated by any individual defendants, the *Monell* claim will also fail.").

Here, Chislett argues that Defendants' "race-based policy" – which "made race a determinative factor in employment decisions and required employees like [her] to attend implicit bias trainings and meetings" – caused her alleged racial discrimination. Opp. at 17. She pursues this Section 1983 claim under three theories: (1) she was demoted pursuant to Defendants' policy that made race a determinative factor in employment decisions, *see id.* at 21-24; (2) she suffered a hostile work environment fostered by mandatory implicit-bias trainings that blamed white employees for being white, *id.* at 19-21; and (3) she was constructively discharged, *id.* at 24-25. The Court will address each in turn.

**I.    Chislett's Demotion**

The Court first addresses Chislett's demotion claim.

**A.   Individual Liability**

Where the alleged constitutional injury in a Section 1983 claim is employment discrimination, courts apply a version of the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Naumovski*, 934 F.3d at 214. "The basic elements of such claims, whether pursued under Title VII or [Section] 1983," require a plaintiff to show that "she suffered an 'adverse employment action' taken 'because of' her [protected characteristic,

such as race or] sex." *Id.* at 212 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)). "The plaintiff must first establish a *prima facie* case by showing that: '(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered [an] adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination.'" *Raspardo*, 770 F.3d at 125 (quoting *Demoret*, 451 F.3d at 151). "Once the plaintiff makes such a showing, the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action." *Id.* "If the defendant is able to make such a showing, 'the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual.'" *Id.* (quoting *Demoret*, 451 F.3d at 151).

The Second Circuit has explained, however, that "[Section] 1983 and Title VII claims differ in important ways." *Naumovski*, 934 F.3d at 212. While a defendant may be liable under Title VII if race was merely a "motivating factor" for an adverse employment action, Section 1983 requires a showing of "but-for" causation. *Id.* at 214. Under the latter standard, a plaintiff must show that "the employee's protected trait actually played a role" and "had a determinative influence" in the employer's decision-making process. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (emphasis and citation omitted) (discussing but-for causation in the context of the Age Discrimination in Employment Act).

This distinction reveals itself at the third step of the *McDonnell Douglas* analysis. *Naumovski*, 934 F.3d at 214. To establish "pretext" under Title VII, a plaintiff "need only prove that the employer's stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action. By contrast, to establish 'pretext' under § 1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an

adverse action."  *Id.* at 214-15 (footnote omitted).  "In other words, a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action."  *Id.* at 215.

Chislett claims that she was demoted because of her race, by supervisors who had "clearly adopted the DOE's views on race."  Opp. at 23.  Defendants argue that race did not have a "determinative influence" on the decision to remove Chislett's supervisory authority, and that Chislett has not refuted their stated reasons for doing so.  Br. at 8; *see id.* at 8-11.  The Court agrees with Defendants on this second point.  Even if the Court assumes that Chislett has made a *prima facie* showing of discrimination under the first step of the *McDonnell Douglas* analysis, it finds that Chislett has failed to produce evidence that would permit a reasonable jury to find that Defendants' stated reasons for removing her supervisory authority were false or pretextual.  *See Naumovski*, 934 F.3d at 218 (reversing a denial of summary judgment on this basis as to a "sex stereotyping"-based claim of sex discrimination under Section 1983).

Winkfield's stated reasons for removing Chislett's supervisory authority are legitimate and non-discriminatory.  Winkfield stated that she had observed Chislett over a two- or three-week period, in both team meetings and one-on-one interactions with other team members.  Winkfield Dep. at 115:22-116:4.  From these observations, Winkfield noted an "almost universal" "pattern of feedback from nearly every member of the team that expressed that they did not believe her to be an effective leader and that they believed that she created chaos and a negative work environment."  *Id.* at 116:5-9.  That criticism came not only from those she supervised, but also from those who either supervised her or worked as her equal at the Department.  *See id.* at 116:9-11 (noting feedback from Kayla Morrow, another Executive Director at OEA), 212:9-213:23 (noting complaints from former colleagues at the Department).

At least three white employees also complained to Winkfield, who is also white, about Chislett's leadership. *See id.* at 211:10-212:4 (describing Chislett as "inconsistent" in her treatment of team members, unprofessional, and ineffective as a leader). These complaints also echo the OEO Report, which independently concluded in October 2018 that Chislett had made inappropriate comments to members of her team. *See generally* OEO Report.

Chislett rejects Winkfield's testimony as "self-serving" and "unsupported." Opp. at 22. Yet Chislett offers no evidence to dispute it, claiming only a bald statement that she "dispute[s]" Winkfield's "unsupported testimony" that multiple employees complained about her and that Winkfield never met with her to communicate such complaints. Chislett Decl. ¶ 63. Similarly, in her Rule 56.1 statement, Chislett does not dispute that Winkfield received negative feedback from her team members; rather, she notes only that she was "unaware of such negative feedback." RSOF ¶ 41; *see id.* ¶¶ 34, 36-38. Without more, Chislett has not rebutted Defendants' proffered reasons for their actions, much less established that those reasons are pretextual. That Winkfield never met with Chislett to communicate the complaints does not mean that the complaints were never made.

Chislett further cites no evidence beyond a conclusory statement that she "disputes" Winkfield's testimony in her affidavit, and therefore has not raised a triable question of fact regarding the cause of her alleged demotion. *See Patterson*, 375 F.3d at 222 (holding that conclusory assertions in supporting affidavit did not create genuine issue of fact); *Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 710 n.2 (S.D.N.Y. 2018) (disregarding factual "assertions that are supported only by the affidavit [the plaintiff] submitted in conjunction with her papers opposing the [defendant's] motion and which are similarly contradicted by the record"). Meanwhile, the OEO Report, while not relied upon directly by Winkfield,

independently corroborates that Chislett at times made inappropriate comments and that her team members complained about her.  Thus, the record before the Court does not permit a reasonable jury to infer that racial discrimination was a "but-for" cause of the decision to remove Chislett's supervisory authority.

### B.  Municipal Liability

Even if Plaintiff had raised an issue of material fact as to whether Winkfield demoted her because of her race, Plaintiff has not set forth evidence from which a reasonable jury could find that her demotion by Winkfield resulted from a municipal race-based employment policy at the Department.  The evidence in the summary-judgment record suggests at most that de Blasio and Carranza believed that senior leadership in the Department should reflect New York City's diversity.  There are no facts from which a jury could find that Defendants adopted a policy under which race was a "determinative factor" in the Department's employment decisions for employees such as Chislett.  Opp. at 17.

As Defendants note, the record provides that the only "determinative" factor for de Blasio and Carranza in selecting candidates for high-level roles in the Department was the candidate's "qualifications to do the job."  Carranza Dep. at 132:2-3; *see* De Blasio Dep. at 59:4-5 ("[T]he primary factor was who could do the job that we were looking to get done.").  Carranza denied that he had any policy or practice to hire people of color to high-level roles.  Carranza Dep. at 169:22-170:7.  Whether a given candidate contributed to a mayoral administration or a Department cabinet that "reflect[ed] the diversity of the city," was a plus, if anything, but not the end-all-be-all.  De Blasio Dep. at 26:14; *see id.* at 59:16-24; Carranza Dep. at 132:13-23.

In response, Chislett points to various public statements but none creates a triable issue of fact.  For example, Carranza's comments welcoming "senior level administrators that look like" "[t]he children in New York City" are precisely that.  ECF No. 51-5 at 3.  That Carranza invited

diverse candidates, or applauded a diverse administration, does not suggest that he or the Department relied on race as a determinative factor in making employment decisions. *See* De Blasio Dep. at 75:4-11 (stating that diverse representation can be achieved "on the front end" by "open[ing] the door wide for a very diverse group of candidates"). Lauding diversity does not, alone, mean there was an intentional effort or policy to disregard qualifications, performance, or merit.

Drawing all reasonable inferences in Chislett's favor, the Court finds insufficient evidence to support a finding that the Department had a policy to make race a determinative factor in all of its employment decisions, including the decision to remove Chislett's supervisory authority. De Blasio described an "organic" hiring process by which the Department aimed for a "representative group" of applicants but otherwise hired them through a "series of individual personnel decisions." De Blasio Dep. at 74:15-75:11. The evidence relied on by Chislett refers, at most, to the employment of senior-level officials at the Department, not those at the level occupied by Chislett. To the extent that the mayor ever allegedly considered race "when making hiring decisions at the DOE," De Blasio Dep. at 50:7-8, he did so only for "[v]ery few" employment decisions, which included selecting Carranza as Chancellor and discussing the immediate team that Carranza had organized, *id.* at 110:6-23. Ramirez's comment that de Blasio sometimes "fixated on [the] diversity of candidates" was made in the context of selecting members of Carranza's cabinet and senior leadership. Ramirez Dep. at 93:3-10.

Chislett nevertheless argues that the Department's alleged policy "trickled down throughout" its ranks, but provides no support for this claim beyond a November 2018 quote from Executive Superintendent Meisha Ross Porter, who was quoted in a news article as saying that: "When I am selecting principals, teachers, or leaders – after we make the list, we look at it

and we count . . . how many women, how many people of color" are on that list.  Opp. at 13-14;

*see* ECF No. 51-4 at 5.  Porter's comment reveals at most that she tracked whether the

employees she hired happened to yield a diverse group of employees; it does not indicate that

Porter did or did not hire anyone based on race.[4]

For all these reasons, insofar as Chislett stakes her Section 1983 claim on her demotion,

the Court grants summary judgment to Defendants.

## II.   Hostile Work Environment

To establish a hostile-work-environment claim under Section 1983, a plaintiff must show

that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of the victim's employment."  *Williams v.*

*N.Y.C. Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023) (citation omitted).  "A hostile work

environment is shown when 'a single incident was extraordinarily severe, or that a series of

incidents were sufficiently continuous and concerted' to be deemed 'pervasive.'"  *Id.* at 69

(quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).  "That analysis includes both an

objective and a subjective component: 'a work environment will be considered hostile if a

---

[4] *Herrera*, 2024 WL 245960, does not upset the Court's conclusion.  There, three white women "who contend that they held high-level positions" at the Department sued for racial discrimination when they were demoted.  *Id.* at *1.  The court denied Defendants' motion for summary judgment, finding enough evidence that a jury could make "a reasonable inference that Carranza and his DOE implemented a policy of demoting and side-lining white staffers . . . in order to change the racial composition of the *leadership*."  *Id.* at *8 (quotation marks and citation omitted; emphasis added).  In so holding, the *Herrera* court relied on its assessment that "[t]he mayor, the chancellor, and others admitted they believed that *high-level staff of the DOE* should have a particular racial composition."  *Id.* (emphasis added).  Chislett cannot reasonably count herself among the "high-level" or "senior" leadership within the Department's cabinet.  At best, she is several steps removed in the Department's organizational hierarchy from the *Herrera* plaintiffs, and the decision does not extend to a policy concerning every position within the Department.  *See id.* at *3-5 (describing the plaintiffs as the former CEO of a Department office that oversaw 250 employees; Executive Director of the Office of Counseling Support Programs; and Senior Supervising Superintendent, a "cabinet-level position").  That the *Herrera* court found an issue of fact as to whether the plaintiffs had shown sufficient evidence of a discriminatory employment policy for high-level Department staff therefore has no bearing here.

reasonable person would have found it to be so and if the plaintiff subjectively so perceived it.'"
*Id.* (brackets omitted) (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.
1999)).  A hostile environment "is actionable only when it occurs because of an employee's
protected characteristic."  *Kirkland-Hudson v. Mt. Vernon City Sch. Dist.*, 665 F. Supp. 3d 412,
465 (S.D.N.Y. 2023) (ellipsis and citation omitted).  The plaintiff must also show "a specific
basis for imputing the conduct that created the hostile work environment to the employer."
*Williams*, 61 F.4th at 69 (ellipsis omitted) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*,
223 F.3d 62, 72 (2d Cir. 2000)).

    Chislett argues that she suffered a hostile work environment, arising from "racial
comments" made by her supervisors, outside trainers, and subordinates, because of a policy by
Defendants that directed Department employees to focus on race.  *See* Opp. at 14-15, 19-21.
Chislett pursues her Section 1983 claim against only the Department itself and Carranza as its
former Chancellor.  Therefore, under this theory, Chislett must "prove that the hostile work
environment she complained of was the product of a [Department] 'policy or custom.'"  *Legg v.
Ulster County*, 979 F.3d 101, 111 n.5 (2d Cir. 2020) (quoting *Monell*, 436 U.S. at 694).

    Even if there were an issue of fact as to whether Chislett can show a hostile work
environment, which the Court does not necessarily agree is the case, *see Gonzalez v. City of New
York*, 377 F. Supp. 3d 273, 297 (S.D.N.Y. 2019) ("Hostile work environment claims are meant to
protect individuals from abuse and trauma that is severe.  They are not intended to promote or
enforce civility, gentility or even decency." (citation omitted)), that environment cannot be
attributed to any policy or custom of Defendants.  While not clearly detailed in her opposition
brief, Chislett's theory of imputation seems to be that the Department's implicit-bias trainings
were a "direct offshoot" of Defendants' supposed policy focusing on race in employment

decisions for senior-level staff, Opp. at 15, and that Defendants' race-based policy shaped the content of these trainings and meetings such that they "went far beyond the noble goal of addressing systemic racism, and instead blamed current Caucasian employees for racial disparities in society," *id.* at 17.

Chislett's theory lacks factual support in the record. To the extent that Defendants plausibly had a policy that focused on race beyond racial disparities in student outcomes, it was one that – even by Chislett's own characterization – focused on race in *employment decisions*. *See* Opp. at 11-18. Chislett does not connect this policy with Carranza's purported focus on providing implicit-bias trainings for Department employees. That the City Council allocated $23 million to develop and scale these trainings does not make them "a direct offshoot of the Chancellor's priorities" as to staffing and employment decisions. *Id.* at 15; *see id.* at 14. Nor do Chislett's references to comments by OEA staff, recognizing that the former Chancellor generally backed OEA's mission, support an inference that the trainings about which Chislett complains were conducted pursuant to a Departmental race-based employment policy. *See id.* at 15 (quoting an OEA staff-meeting agenda and a comment by an OEA executive director). In short, Chislett does not link the alleged employment policy on which she seeks to establish Defendants' liability with the Department's implicit-bias trainings.

Further, there is no evidence from which a jury could find that the Department's direction that the OEA conduct implicit-bias training for Department employees establishes a hostile work environment. Chislett does not suggest that Carranza himself had any involvement with the trainings beyond the fact that after he became Chancellor, "the DOE adopted a policy to conduct trainings on 'implicit bias' for DOE employees." Chislett Decl. ¶ 17. Many of the statements that Chislett relies upon were not part of any training curriculum; they were contemporaneous

comments made by her colleagues.  *See, e.g.*, *id.* ¶¶ 35-36 (response to Chislett's decision not to participate in exercise), 47 (overheard comment by Robinson), 68 (small-group comments); RSOF ¶ 24 (citing "offensive and demeaning name-calling").  That the Department's diversity trainings provided a forum to talk about race does not mean that, when a particular training results into a heated back-and-forth, the words exchanged are pursuant to an official policy of the municipality.  To hold Defendants liable for every comment during an OEA training or meeting would amount to *respondeat superior* liability, "which cannot be the basis of municipal defendant liability under" Section 1983.  *Littlejohn*, 795 F.3d at 315.

Chislett also relies on other comments that were not made during training sessions at all.  *See* Chislett Decl. ¶¶ 75, 77 (cabinet-planning meeting), 77 (same).  The meeting on May 23, 2019, for example, was an annual OEA retreat during which Ababio-Fernandez expected to focus on "strategic planning"; it was not an official implicit-bias training.  RSOF ¶ 45; *see* ECF No. 50-34 at 174:2-5, 176:7-11.  Further straining Chislett's link to a municipal implicit-bias training policy is the fact that some of the trainings she attended were separate and apart from the Department's initiative to provide implicit-bias trainings to its employees.  For example, OEA scheduled its training on May 4, 2018 because of a prior personnel incident with Chislett, not because of any Department policy.  *See* Chislett Decl. ¶¶ 46-47.  Similarly, the Department-wide "Beyond Diversity" training on June 21, 2018, was unrelated to the implicit-bias trainings headed by OEA and provided throughout the city.  *See id.* ¶ 31; ECF No. 50-30 at 118:25-119:9 (distinguishing "Beyond Diversity" trainings from the Department's implicit-bias trainings).  So too for the AP for All team's eight weeks of "racial literacy trainings" ordered by Winkfield in April 2019.  Chislett Decl. ¶ 80.

Chislett's characterization of the workplace also cuts against imputation of her

colleagues' comments to a policy of Defendants, given her assertion that her workplace was racially charged before any such policy or trainings.  *See* Opp. at 5 ("[E]ven before these overtly racialized trainings, Chislett had already endured a workplace that was hyper-focused on race and was hostile to her because she is Caucasian."); *id.* at 6 (noting that "[t]he DOE's meetings and trainings . . . exacerbated" a workplace that was already "racially charged" (hyphen omitted)).  Chislett's claim that her workplace was hostile before Carranza's appointment as Chancellor in April 2018 cannot therefore be attributed to Carranza and the Department under his oversight.

At bottom, Chislett's hostile-work-environment claim is too removed from a purported race-based municipal policy to succeed.  Chislett's theory of liability asks the Court to connect far too many dots between a Department policy (assuming one exists) and her alleged constitutional violation.  Concluding otherwise would expand *Monell* liability far beyond its current boundaries.  *See Brown*, 520 U.S. at 415 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.").  Drawing all inferences in Chislett's favor, the Court holds that no reasonable jury could conclude that "through its *deliberate* conduct, the municipality was the moving force behind the injury alleged," *Agosto*, 982 F.3d at 98 (quotation marks and citation omitted), or that Carranza, as Chancellor of the Department, "created a policy or custom under which unconstitutional practices occurred," *Littlejohn*, 795 F.3d at 314 (citation omitted).  Therefore, insofar as Chislett stakes her Section 1983 claim on a hostile work environment, the Court grants summary judgment to Defendants.

## III.   Constructive Discharge

Finally, Chislett argues that her work environment was so intolerable as to amount to a constructive discharge.  *See* Opp. at 24-25 (referencing "what occurred at the May 23, 2019

retreat," "the months of increasingly hostile trainings and meetings," and "the DOE diminishing her material responsibilities").  "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff 'must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'"  *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)).  "This standard is higher than the standard for establishing a hostile work environment."  *Id.*; *see Chenette v. Kenneth Cole Prods., Inc.*, 345 F. App'x 615, 620 (2d Cir. 2009) (summary order) ("Having failed on her hostile work environment claim, [the plaintiff] can neither survive summary judgment on her constructive discharge claim, which requires evidence of even more severe conditions." (quotation marks and citation omitted)); *Kunik v. N.Y.C. Dep't of Educ.*, No. 15-cv-09512 (VSB), 2017 WL 4358764, at *11 (S.D.N.Y. Sept. 29, 2017) (dismissing Section 1983 constructive-discharge claim where plaintiff failed to state a hostile-work-environment claim under the same acts).

Even if Chislett has raised issues of fact regarding an intolerable work atmosphere, her claim still fails for the same reason that her hostile-work-environment claim fails: she does not offer evidence plausibly indicating that either the Defendants' alleged policy focusing on race in employment decisions or its initiative regarding implicit-bias training led to the purported equal-protection violation (here, her constructive discharge).  *See Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 589 (S.D.N.Y. 2014) (dismissing Section 1983 constructive-discharge claim based on failure to state a claim for municipal liability), *disapproved on other grounds by Agosto*, 982 F.3d at 100 n.7.  As discussed above, Chislett has not adequately traced her allegedly intolerable work conditions to a municipal policy by Defendants.  Therefore, the Court grants summary judgment to Defendants on Chislett's constructive-discharge claim.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment.  Plaintiff's claim under Section 1983 is dismissed.  The Clerk of Court is respectfully directed to terminate the motion at ECF No. 40 and to close the case.

Dated: March 14, 2024
       New York, New York

                                        SO ORDERED.

                                        JENNIFER L. ROCHON
                                        United States District Judge